**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | Case No.: |
| vs. | ) | 1:25-cr-549-01-VMC |
| | ) | |
| SHAMARRI TACHE BROOKS | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

**Introduction**

Shamarri Tache Brooks has accepted responsibility for serious criminal conduct. He pled guilty on May 7, 2026, shortly after his arrest. He accepts full responsibility for his actions that led him here. But the disputed advisory Guidelines range of 145 to 175 months is driven by a $6.5 million intended-loss figure that produced no actual losses. It is driven by a victim enhancement in case in which no victim suffered financially. It is driven by a firearms enhancement based on firearms that Mr. Brooks disclosed to law enforcement and that the government has not shown were in any way connected to the offense. Simply put, the range reflects the seriousness of what the government theorizes could have happened, not what did happen.

Mr. Brooks asks the Court to: (1) sustain his objection to the loss amount and exclude checks merely possessed but not proven intended for negotiation; (2) decline to apply the two-level firearm enhancement under § 2B1.1(b)(16)(B); and (3) vary downward under 18 U.S.C. § 3553(a).

## Factual Background

### A. The Offense Conduct

Mr. Brooks participated in a scheme involving the promotion and sale of stolen check images, and the deposit of altered checks at ATMs. (PSR ¶¶ 10-19.) He personally deposited six altered checks; his co-defendant deposited four more. (PSR ¶¶ 20-21.) All ten failed to clear. (PSR ¶ 81.) No victim suffered any financial loss. (PSR ¶ 81.)

The government's $6,574,288.52 intended-loss calculation derives overwhelmingly from the face value of checks seized during searches in January 2024 and January 2026 (~$5.24 million), not from checks actually deposited. (PSR ¶¶ 37, 73, 78.)

The government's loss theory paints a picture of a sophisticated operation. The results tell a different story. Mr. Brooks deposited altered checks while wearing branded balaclava masks, posted ATM receipts to his public Instagram, sold the crude "Sauce Book" through a Telegram channel using his known moniker, and directed payments to accounts in his own name. (PSR ¶¶ 14-15, 17-19, 52, 57.) He used no sophisticated obfuscation, no anonymous payment methods, and no meaningful operational security. Every check was caught by routine fraud-detection systems. The sentence should reflect what actually happened: unsophisticated criminal activity that caused no financial harm to any victim.

### B. Mr. Brooks's Swift Acceptance of Responsibility

During the January 2026 search of his home, Mr. Brooks voluntarily disclosed the location of two firearms in the kitchen cabinets without being

asked. (PSR ¶ 75.) He waived Miranda, admitted involvement, and provided passwords to his electronic devices. (PSR ¶ 77.) He pled guilty on May 7, 2026. From the earliest moments of law enforcement contact, Mr. Brooks chose candor over concealment

The irony of the firearm enhancement pursued by the government should not be lost on the Court. Despite it not being included in the initial PSR, the government seeks a two-level increase based on firearms whose location Mr. Brooks voluntarily disclosed. His cooperation is being used to increase his sentence.

**C. Mr. Brooks's Personal History**

Mr. Brooks is a 34 year-old father. (PSR at p. 3; ¶ 126.) His mother, Evelia Brooks, has been diagnosed with schizophrenia, and Mr. Brooks has been her primary caretaker. (PSR ¶ 119.) As he told the Probation Office: "She's my world because I know no one else can handle her . . . I've just been having to parent her my whole life." (PSR ¶ 119.) His eldest daughter, Sarriyah (13), also suffers from schizophrenia and was recently admitted to Georgia Regional Hospital. (PSR ¶ 126.) Mr. Brooks's absence has left both his mother and his daughter without the person they most depended upon.

The Court may consider these extraordinary family circumstances in fashioning a sentence. *See United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992) (family circumstances become relevant where "it is clearly established that the defendant is a unique source of financial and/or emotional support for a significant number of dependents"; courts should be "reluctant to wreak extraordinary destruction" on those who rely heavily on the defendant). Mr.

Brooks is the primary caretaker for a mother with schizophrenia, a daughter recently hospitalized with the same condition, and eleven other dependents. A sentence of 145 to 175 months would wreak precisely the kind of extraordinary destruction on his dependents.[1]

Mr. Brooks has led a difficult life. For example, on December 11, 2020, he was shot by an unknown assailant in the parking garage oof a residential apartment complex and still suffers pain from that injury. (PSR ¶ 133.)

Despite these challenges, Mr. Brooks was on ther verge of significant success in the music industry, who signed with Empire Records in 2022 and re-signed in 2023 for a three-tape deal. (PSR ¶¶ 145-147.)

Terri Reynolds, the mother of several of Mr. Brooks's children and his partner of seven years, writes that he "has always been an important part of [his children's] lives" and confirms that he has served as "the full-time caregiver for his mother, who has a mental disability and relies heavily on him for her daily needs." Ms. Reynolds describes the past year as "one of the hardest periods the family has ever experienced" and expresses concern about Mr. Brooks's untreated medical condition while detained. *See* Exhibit A.

Chillonda Brown, Mr. Brooks's aunt, provides the most detailed account of his caretaking role. She writes that when Mr. Brooks is home, he "helps [his

---

[1] The Guidelines previously allowed for a downward departure based on the loss of caretaking and support for the defendant's family. *See former* U.S.S.G. § 5H1.6. Although the Sentencing Commission removed this, and other departure provisions last year, the Commission has made clear that such considerations are relevant for consideration under the 3553(a) factors. *See* U.S. Sentencing Comm'n, Amendments to the Sentencing Guidelines (eff. Nov. 1, 2025) at p. 84, available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202505_RF.pdf.

mother] with her day-to-day life and provides the support she needs to remain outside of a facility and live as independently as possible." Ms. Brown explains that Mr. Brooks "has helped [his mother] financially, assisted her with managing her finances, and helped with everyday responsibilities that can become overwhelming because of her mental health challenges." Without him, she writes, "it becomes much more difficult to make sure that she is safe, stable, and able to remain in the community." See Exhibit B.

Demaunte Brown, his cousin, writes that Mr. Brooks "has always been there for" his mother and that "[s]ince he has been gone, that absence has been felt in a major way." *See* Exhibit C. Ashley Lazenby, a fifteen-year friend, writes that Mr. Brooks "has consistently shown love, loyalty, and compassion" and "remained active in the lives of all 12 of his children." *See* Exhibit D. Cherish Kenner, the mother of one of his children, writes that he is "a devoted son, father, and family member" whose children "need their father." *See* Exhibit E. Ms. Kenner describes this experience as "a life-changing wake-up call" and believes Mr. Brooks "is committed to ensuring that this is the last time he finds himself in this position."

In his interview with the Probation Office, Mr. Brooks stated: "I've been running around way too much, and I'm too old. I'm through with the old life." (PSR ¶ 130.) The Court need not take that statement on faith alone. Mr. Brooks's immediate cooperation, swift plea, and the letters submitted herewith supports the conclusion that he is prepared leave his old life behind.

## Argument and Citation of Authorities

### A. The PSR Overstates the Intended Loss.

The PSR calculates intended loss at $6,574,288.52, driving an 18-level enhancement under U.S.S.G. § 2B1.1(b)(1). (PSR ¶¶ 78, 85.) Approximately $5.24 million of that figure (roughly 80%) derives from the face value of checks seized during the January 2024 and January 2026 searches. (PSR ¶¶ 29, 37.) Mr. Brooks objects because the government has not proven he intended to negotiate those checks. The government's own evidence shows he intended to sell them.

Intended loss is "the pecuniary harm that the defendant purposely sought to inflict." U.S.S.G. § 2B1.1 n.3(A)(ii). The estimate must rest on "reliable and specific evidence." *United States v. Gupta*, 463 F.3d 1182, 1200 (11th Cir. 2006); *United States v. Stein*, 846 F.3d 1135, 1152-53 (11th Cir. 2017) ("Although the district court may estimate the amount of loss, it cannot 'speculate about the existence of facts and must base its estimate on reliable and specific evidence.'"). The government bears the burden of proving loss "attributable to the defendant's conduct." *Id.* at 1152.

Mr. Brooks does not dispute that he deposited or attempted to deposit altered checks. Ten checks were deposited across both defendants: six by Mr. Brooks, four by his co-defendant Morgan Davis-Vauls. (PSR ¶¶ 20-21.) The face value of those checks totals approximately $1,328,517. (PSR ¶¶ 41-50.) None cleared. (PSR ¶ 81.) Mr. Brooks accepts that this figure represents his intended loss for Guidelines purposes.

The remaining approximately 2,175 seized checks (roughly $5.24 million of the PSR's loss figure) were not deposited, not altered for deposit, and not paired

with mule accounts. The PSR treats them as checks Mr. Brooks intended to negotiate at face value. But the government's own case tells a different story: Mr. Brooks was predominantly in the business of buying and selling stolen check images.

The indictment itself reflects this distinction. Counts 1 through 10 charge specific deposit transactions, which were the checks Mr. Brooks and his co-defendant actually negotiated or attempted to negotiate. Count 14 separately charges possession of stolen mail. (Doc. 1 at pp. 7-12, 16.) The government drew a line between checks used in fraud and checks merely possessed. The PSR erases it.

The government's undercover operations confirm that Mr. Brooks's primary activity was resale. He sold stolen check images and the Sauce Book through Instagram and Telegram. (PSR ¶¶ 14-19.) The undercover agent purchased check images from Mr. Brooks; the transaction was a sale, not an attempt to negotiate the checks. (PSR ¶¶ 17-19.) The government charged that sales activity as the core of the conspiracy. The seized checks were inventory for that business.

Probation's response to the objection posits that "the recovered checks were maintained for future negotiation" based on the presence of scanners, printers, check paper, an embossing machine, and checks "positioned on a scanner," combined with Mr. Brooks's prior deposits. (PSR ¶ 29, Addendum.) This reasoning does not withstand scrutiny.

First, the government's own case establishes that Mr. Brooks operated two distinct lines of activity: depositing altered checks at ATMs, and selling stolen

check images to others. Probation's response does not distinguish between these two activities. It treats all seized checks as intended for personal negotiation without identifying which checks (if any) were destined for deposit rather than sale. The government bears the burden of establishing intended loss by a preponderance of the evidence, and that burden requires more than pointing to equipment and inventory that served both sides of the operation. Where the evidence establishes two separate uses for the same category of property, the government must prove check by check which were intended for negotiation. It has not done so.

Second, Probation's inference from the ten deposited checks to the remaining 2,175 does not follow. That Mr. Brooks deposited ten checks does not establish, even by a preponderance, that he intended to deposit two thousand more. To the contrary, the pattern proves selectivity: over a period of months, he deposited only ten while accumulating thousands.

The timeline is telling. The last deposit the government can identify occurred on August 30, 2024. (PSR ¶ 50.) Mr. Brooks was not arrested until January 8, 2026, over sixteen months later. During that entire period, the government was actively investigating: it ran two undercover operations (PSR ¶¶ 57-68), monitored his social media accounts, and observed his continued online activity. (PSR ¶ 40.) What the government found during those sixteen months was sales (check images sold to undercover agents and advertised on Telegram) but not a single additional deposit or attempted deposit at any ATM. If Probation's theory is correct that 2,175 checks were being held for future negotiation, the government should be able to point to at least one deposit

attempt in the sixteen months it was watching. It cannot. The more logical inference is that Mr. Brooks had moved entirely to the sales side of the business, and the 681 checks seized from Heather Stone Way in January 2026 were inventory for that business, not a deposit queue.

Third, Probation's assertion that "the search warrant interrupted the ongoing scheme before all the fraudulently obtained checks could be negotiated" assumes the very fact it purports to prove. The search did not interrupt a deposit operation in progress. The search interrupted a sales operation, one in which Mr. Brooks was actively distributing check images to buyers through social media.

The intended-loss question is not whether Mr. Brooks possessed stolen checks or understood how check fraud works. It is whether he "purposely sought to inflict" $6.5 million in bank losses. § 2B1.1 n. 3(A)(ii). A defendant who sells stolen checks intends *to profit from the sale*, not to personally cause the bank loss that a buyer might later attempt to inflict.

The Eleventh Circuit has not adopted a per se rule that seized checks automatically count at face value. In *United States v. Grant*, 431 F.3d 760, 762-65 (11th Cir. 2005), the court approved face-value calculations where evidence supported an inference of intent to use, which was an evidentiary sufficiency holding, not a rule of automatic aggregation. In *United States v. Nosrati-Shamloo*, 255 F.3d 1290, 1291-92 (11th Cir. 2001), the court permitted face-value loss for fraudulently obtained credit cards because they gave immediate access to funds. But stolen checks are not self-executing credit lines. Converting a stolen check into a bank loss requires multiple additional steps: altering the payee, opening or accessing a depository account, evading the bank's verification systems, and

withdrawing funds before the fraud is detected. The Guidelines require proof that Mr. Brooks intended to take those steps himself, and the government's own evidence shows he was selling check images to others, not depositing them.

This aligns with the broader principle that incomplete criminal conduct should not be punished as if completed. *Cf.* U.S.S.G. § 2X1.1(b)(1) & cmt. background (reducing offense level by 3 where "the arrest occurs well before the defendant or any co-conspirator has completed the acts necessary for the substantive offense"); *United States v. Khawaja*, 118 F.3d 1454, 1457-58 (11th Cir. 1997) (vacating sentence where district court failed to apply § 2X1.1 reduction; defendants intended to launder $2 million but completed only $570,556 in transactions before apprehension).

The relevant-conduct rules impose an additional limit. Jointly undertaken activity is not coextensive with the outer bounds of a broader scheme. *See* U.S.S.G. § 1B1.3(a)(1)(B) (relevant conduct in jointly undertaken criminal activity limited to acts "within the scope of the jointly undertaken criminal activity" that were "in furtherance of that criminal activity" and "reasonably foreseeable in connection with that criminal activity"); *United States v. Presendieu*, 880 F.3d 1228, 1245-46 (11th Cir. 2018) (holding defendant in check-cashing conspiracy accountable only for $193,132 in losses directly attributable to her conduct, not the broader conspiracy's $2.5 million loss, because "a defendant's relevant conduct extends only as far as the scope of her jointly undertaken criminal activity"); *United States v. Hunter*, 323 F.3d 1314, 1319-20 (11th Cir. 2003) (vacating sentences attributing entire $125,000 loss of counterfeit-check ring to each participant; "the fact that the defendant knows about the larger operation, and

has agreed to perform a particular act, does not amount to acquiescence in the acts of the criminal enterprise as a whole").

Even if downstream buyers intended to negotiate some of the checks Mr. Brooks sold, the loss attributable to Mr. Brooks under § 1B1.3 is limited to the harm he personally intended to cause (*i.e.*, the sales price of the checks); not the full scope of what others might have done with checks he sold them.

Mr. Brooks requests that the Court calculate intended loss based on the face value of checks actually deposited or attempted — approximately $1,328,517 (PSR ¶¶ 41-50) — and exclude checks that were merely possessed as inventory for resale but not deposited, attempted, altered for deposit, or otherwise proven intended for personal negotiation. Under § 2B1.1(b)(1)(H), this results in a 14-level enhancement rather than 18 levels, reducing the adjusted offense level from 30 to 26 before acceptance.

**B. The Court Should Not Apply the Firearm Enhancement.**

The PSR applies a two-level enhancement under U.S.S.G. § 2B1.1(b)(16)(B) for possession of a firearm "in connection with" the offense. (PSR ¶ 88b.) But the government has not shown any nexus between the firearms and the check-fraud scheme.

Section 2B1.1(b)(16)(B) requires that the firearm have been possessed "in connection with" the fraud offense. Under Eleventh Circuit precedent, this means the firearm must have "facilitated, or had the potential of facilitating" the offense. *United States v. Matos-Rodriguez*, 188 F.3d 1300, 1308-09 (11th Cir. 1999) (interpreting identical "in connection with" language under § 2B5.1(b)(3), the counterfeiting guideline); *see also United States v. Delva*, 922 F.3d 1228, 1255 (11th

Cir. 2019) (applying *Matos-Rodriguez* standard to § 2B1.1). The court looks at "the circumstances surrounding the offense and firearm possession to determine whether it is reasonable to infer that the firearm might be used during an offense." *Delva*, 922 F.3d 1228, 1255 (11th Cir. 2019) (citing U*nited States v. McClain*, 252 F.3d 1279, 1288 (11th Cir. 2001)). Mere possession can suffice only "where it is reasonable to assume that a defendant possesses a firearm, even without using it, to prevent the theft of [fraud proceeds] in his possession." *United States v. Jackson*, 276 F.3d 1231, 1234 (11th Cir. 2001) (interpreting firearm enhancement under § 2K2.1.

The Eleventh Circuit cases applying this standard in the financial crime context have uniformly required evidence of a functional relationship between the firearm and the criminal conduct; not mere co-location in the same residence. In *Delva*, the court upheld the enhancement where the defendant admitted in a post-Miranda statement that firearms were kept "for protection from getting robbed," a rifle was leaning against the wall in the same room where the defendants were actively processing fraudulent tax returns, and $29,000 in fraud proceeds were stored in a safe at the same location. 922 F.3d at 1254-56. In *Matos-Rodriguez*, the defendant possessed a pistol "to prevent theft during a close, face-to-face, hand-to-hand encounter with a person he apparently did not know well" while passing counterfeit bills. 188 F.3d at 1309. In *United States v. Rhind*, 289 F.3d 690, 695 (11th Cir. 2002), the firearms were in the car used to transport and pass counterfeit bills across state lines. In *United States v. Davis*, 742 F. App'x 435, 439 (11th Cir. 2018), the defendant carried a firearm while physically stealing from ATMs. In *United States v. Black*, 678 F. App'x 870, 875 (11th Cir. 2017), firearms

were on the desk where the defendant conducted criminal transactions in a room only he controlled (along with a safe containing cash), and there was a violent home invasion.

The common thread in every case is that the firearm was either present during the fraudulent transactions themselves or functionally linked to executing or protecting the criminal activity. None involved a firearm stored in a home simply because fraud evidence was also found in the home.

Mr. Brooks's case is fundamentally different. The fraud here consisted of depositing altered checks at ATMs, which is a non-confrontational act that does not involve face-to-face encounters, does not generate proceeds to guard on-site, and does not create robbery risk during the transaction. Unlike *Delva*, there is no admission that firearms were kept for protection of fraud activity. Unlike *Matos-Rodriguez* and *Rhind*, no firearm was present during any fraudulent transaction. Unlike Davis, Mr. Brooks was not carrying a weapon while committing the offense. Unlike *Black*, the firearms were not found in a workspace dedicated to criminal activity.

This standard is also materially more demanding than the firearm enhancement under the drug-trafficking guideline, § 2D1.1(b)(1), which shifts the burden to the defendant to prove the connection was "clearly improbable" once the government shows a firearm was present at the site of drug activity. *United States v. Stallings*, 463 F.3d 1218, 1220 (11th Cir. 2006). That burden-shifting framework reflects the presumption that drug dealers keep firearms as "tools of the trade." *Id.* at 1221 (quoting *United States v. Alvarez*, 755 F.2d 830, 849 (11th Cir. 1985)). No such presumption exists for fraud offenses.

Yet even under that more permissive standard, the Eleventh Circuit reversed the enhancement in *Stallings* where police found three pistols in a drug conspirator's home but no witness testified to firearms use during transactions, no drug activity occurred in the home, and the home was shared with other adults. 463 F.3d at 1220-21. The court held that "the mere fact that a drug offender possesses a firearm does not necessarily give rise to the firearms enhancement" and that the government must show "some nexus beyond mere possession." *Id.* at 1221. If co-location is insufficient under § 2D1.1's lenient standard, it cannot suffice under § 2B1.1(b)(16)(B)'s affirmative-connection requirement.

The record provides independent explanations for firearm possession: Mr. Brooks was shot in 2020 and still suffers pain (PSR ¶ 133); he voluntarily disclosed the firearms' location to agents (PSR ¶ 75); and both residences were shared with family members (PSR ¶¶ 33, 71, 119). The government's theory amounts to a per se rule that firearms in the same home as fraud evidence trigger the enhancement. That theory fails under the applicable standard, and it would fail even under § 2D1.1's more permissive framework, as *Stallings* demonstrates. Mr. Brooks requests that the Court decline to apply the enhancement.

### C. A Downward Variance Is Warranted Under 18 U.S.C. § 3553(a).

Even if the Court overrules Mr. Brooks's Guidelines objections, the resulting range of 145 to 175 months is greater than necessary to serve the purposes of sentencing under 18 U.S.C. § 3553(a).

### 1. **The Loss-Driven Range Overstates the Seriousness of the Offense.**

The 18-level loss enhancement adds over 100 months to the bottom of the range. (PSR ¶ 85.) Without it, the range on Count 8 would be 12 to 18 months. That enhancement rests on a $6.5 million intended-loss figure of which not one dollar was realized. Restitution is zero. (PSR ¶ 81.) No victim filed an impact statement. The total face value of checks actually deposited across all defendants was approximately $1,328,517 (PSR ¶¶ 41-50). Every deposited check failed to clear. (PSR ¶¶ 47, 54, 56.)

The loss table is "a proxy for the seriousness of the offense and the defendant's relative culpability." *United States v. Campbell*, 765 F.3d 1291, 1301 (11th Cir. 2014) (internal quotation marks omitted). When the proxy breaks down, the Court has discretion to account for that disparity. *Gall v. United States*, 552 U.S. 38, 49-50 (2007); *United States v. Irey*, 612 F.3d 1160, 1189-90 (11th Cir. 2010) (en banc). The Eleventh Circuit recognizes that loss may "under- or overestimate[] the seriousness of the offense." *Campbell*, 765 F.3d at 1301.

The Guidelines commentary used to instruct that "t]here may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense" and "in such cases, a downward departure may be warranted." *See* 2B1.1, former cmt. 19(c). Although the Commission removed former Application Note 19(C)'s departure language in an effort to simplify the Guidelines, it stated that "judges who would have relied upon facts previously identified as a basis for a departure will continue to have the authority to rely upon such facts . . . as a variance under 18 U.S.C. § 3553(a)." U.S. Sentencing Comm'n, Amendments to the Sentencing Guidelines (eff. Nov. 1, 2025) at p. 84,

available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202505_RF.pdf; *see United States v. Rosen*, 726 F.3d 1017, 1027 (7th Cir. 2013) (court may "consider the amount of variance between the intended loss and the realistic possibility of loss"); *United States v. Corry*, 206 F.3d 748, 751 (7th Cir. 2000) (where intended loss "significantly overstates the seriousness" of the defendant's conduct, it is "an encouraged basis for departure.")

Other courts have varied downward on analogous facts. In *United States v. Murphy*, 815 F. App'x 918, 922 (6th Cir. 2020), the court varied from 27-33 months to 12 months where intended loss of $945,000 "would have been impossible to achieve given the circumstances." In *United States v. Burgos*, No. 1:12–CR–49–TLS, 2015 WL 6447766, at *3-5 (N.D. Ind. Oct. 23, 2015), the court varied downward where three fraudulent checks totaling $70,000 were never honored, finding an "extreme" discrepancy (1,406:1 ratio). *See also United States v. Roen*, 279 F. Supp. 2d 986, 991-92 (E.D. Wis. 2003) (granting 9-level downward departure where defendant passed fraudulent checks on a closed account, none were honored, and intended loss of $1.2 million bore "little or no relation to economic reality" given $19,000 in actual loss).

Mr. Brooks's case is more compelling. His ratio is effectively infinity: no bank or person suffered a loss. And according to the PSR, his advisory range is 145 to 175 months, not 21-33 months. Even if the $5.24 million in undeposited checks is properly included in the Guidelines calculation, the Court must still impose a sentence "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). The government's own plea agreement, in recommending a 2-level

variance and low-end sentence (PSR ¶ 25(d)), concedes that the range overstates culpability. But the disparity between $6.5 million in intended loss and zero victim loss warrants far more than two levels.

### 2. The Victim Enhancement Further Inflates the Advisory Guidelines Range.

The Guidelines range is further overstated by application of the 2-level victim enhancement under § 2B1.1(b)(2)(A)(i). The PSR identifies more than ten "victims" to trigger the enhancement. (PSR ¶ 86.) But that count depends entirely on Application Note 1(E), which expands the definition of "victim" in cases involving means of identification to include "any individual whose means of identification was used unlawfully or without authority," regardless of whether that individual sustained any actual loss. U.S.S.G. § 2B1.1 cmt. n.1(E).

The guideline's primary definition of "victim" in Application Note 1 is "any person who sustained any part of the actual loss." Under that definition, the victim count here would be far lower — perhaps zero individuals, given that no check cleared. (PSR ¶ 81.) Application Note 1(E) reaches further: it counts individuals as victims even if their accounts were never debited and they lost nothing. The individuals whose means of identification were used in this scheme (the account holders whose checks were stolen and altered) suffered no pecuniary harm whatsoever.

The Court may consider, in assessing the seriousness of the offense and whether the advisory range is greater than necessary, that the victim enhancement rests on an application note that expands "victim" beyond its ordinary meaning and beyond the guideline's own primary definition. There is reason to question whether an application note that counts individuals who

sustained no loss as "victims" is truly interpreting the guideline or enlarging it. *See United States v. Dupree*, 57 F.4th 1269, 1273-1279 (11th Cir. 2023) (holding commentary cannot expand the interpretation of unambiguous sentencing guidelines); *Kisor v. Wilkie*, 588 U.S. 558, 575-76 (2019) (deference to agency interpretation requires genuine ambiguity after exhausting traditional tools of construction).

The Court need not resolve that question to recognize that the enhancement, as applied here, inflates the advisory range based on theoretical harm to individuals who were never actually harmed. Together, the loss enhancement and the victim enhancement add 20 levels to the offense level based entirely on what could have happened but did not. That cumulative inflation is precisely the kind of mechanical overstatement that § 3553(a) empowers the Court to correct.

### 3. Mr. Brooks's Conditions of Pretrial Confinement Have Been Unusually Punitive.

Mr. Brooks has been detained at the Robert A. Deyton Detention Facility since January 8, 2026. On June 9, 2026, he was diagnosed with epididymitis, a painful urological condition that typically resolves with antibiotics within one to two weeks. (PSR ¶ 135.) Instead, he has endured over two months of severe pain awaiting surgery, with the facility repeatedly failing to provide timely specialist care.

The facility administered two courses of antibiotics. The facility's own doctor acknowledged that the first course was "inadequate" and restarted treatment on June 27. (PSR ¶ 136.) Mr. Brooks completed the second course in full by July 7. It did not resolve the condition. At that point, the only remaining

medical option was a urology referral, which had been requested on June 29 and approved by the U.S. Marshals Service on July 1. But the facility did not act on the approval. By July 9, defense counsel contacted the AUSA, who intervened with the Marshals Service the same day. On July 15, two weeks after USMS approval, Mr. Brooks still had not been seen. For reasons that no one has attempted to explain, Mr. Brooks was not seen by a urologist until July 31: a full month after the referral was approved, and over seven weeks after diagnosis. He was forced to endure tremendous pain during this unwarranted delay.

At the July 31 appointment, the urologist determined that Mr. Brooks requires surgery. Despite additional attempts at intervention through the Marshals Service to facilitate prompt care, the surgery has not taken place as of the date of this filing, more than two months after diagnosis and more than six weeks after the specialist confirmed it was necessary.

The severity of Mr. Brooks's pain during this period is not in dispute. At his PSR interview on June 23, both the Probation Officer and defense counsel observed him doubled over in pain and barely able to speak. He was in the same condition during subsequent meetings with counsel in July. Throughout this period, the facility's only response was Tylenol, Motrin, and ice packs. (PSR ¶ 137.)

The Court may consider unusually harsh pretrial conditions as a variance factor. 18 U.S.C. § 3553(a)(1), (a)(2)(D). In evaluating the justness of punishment, "it is important to consider all other forms of punishment [the defendant] has already suffered." *United States v. Vigil*, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007). Mr. Brooks has already endured months of severe, inadequately treated pain as a

consequence of his pretrial detention, which is punishment that no sentence of imprisonment was designed to impose. That reality should inform the Court's determination of what further punishment is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a).

The Eleventh Circuit has recognized this authority. *United States v. Pressley*, 345 F.3d 1205, 1218-19 (11th Cir. 2003) (holding that conditions of pretrial confinement were not adequately considered by the Sentencing Commission and could be sufficiently unusual to take a case outside the Guidelines heartland); *United States v. Goodman*, 807 F. App'x 938, 940-41 (11th Cir. 2020) (assuming authority to depart based on pretrial conditions in this district); *United States v. Bravo*, 271 F. App'x 877, 879-80 (11th Cir. 2008) (affirming consideration of pretrial conditions in imposing low-end sentence in this district). Mr. Brooks has spent over seven months in pretrial detention, a substantial portion involving documented, inadequately treated pain materially more punitive than ordinary confinement.

**4. The Advisory Guidelines Range Creates an Unwarranted Sentencing Disparity.**

Section 3553(a)(6) directs the Court to avoid "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." A sentence at or near the advisory range would produce a stark disparity with sentences this Court has imposed in fraud cases involving far greater actual harm:

- *United States v. Hesenius*, No. 1:23-CR-282-VMC: Embezzled $8.6 million in actual loss over five years; criminal fraud history dating to the 1980s; committed offense while on state probation. Sentenced to 72 months.

- *United States v. Dupiton*, No. 1:26-CR-00012-VMC: Used hundreds of stolen identities to obtain $3.8 million in fraudulent unemployment benefits, personally withdrawing over $2 million; committed scheme while on federal sentence for prior fraud. Sentenced to 84 months.

- *United States v. Harris*, No. 1:23-CR-00005-VMC: Former NFL player fraudulently obtained $968,405 PPP loan. Sentenced to 16 months.

- *United States v. Muhammad*, No. 1:22-CR-311-VMC: Defrauded Delta Air Lines of $447,876. Sentenced to 6 months (range 21-27).

Other judges in this district have imposed comparable sentences in cases involving far greater harm, personal profit, and sophistication:

- *United States v. Bradford*, No. 1:25-CR-475 (N.D. Ga. Nov. 12, 2025): Executive in Ponzi scheme who was an integral participant for years and profited substantially. Filings indicate he was highly educated and grew up privileged. Sentenced to 48 months, far below Guidelines range.

- *United States v. Edwards*, No. 1:26-CR-60 (N.D. Ga. Feb. 17, 2026): Co-executive in the same Ponzi scheme. Like *Bradford*, filings also indicate Edwards was highly educated and privileged. Sentenced to 24 months, far below Guidelines range.

Mr. Brooks's scheme produced zero unrecovered victim loss and zero restitution. His advisory range of 145 to 175 months is more than double what this Court imposed on a serial fraudster who actually stole and spent $8.6 million. It is triple the sentence imposed on an executive who profited from the largest in Georgia history and six times the sentence imposed on his co-executive.

The contrast in criminal history sharpens the disparity further. Despite Criminal History Category III, Mr. Brooks has never served more than 60 days in custody. (PSR ¶¶ 101-106.) His prior sentences were entirely probationary, and he has no prior fraud convictions other than the state charge arising from this

same investigation. This is his first federal conviction and first significant period of incarceration. By contrast, Hesenius committed her offense while on state probation for a prior fraud conviction dating to the 1980s, and Dupiton committed his scheme while serving a federal sentence for a prior fraud conviction. A sentence of 60 months is not lenient for a defendant who has never experienced meaningful incarceration. It represents a transformative consequence that satisfies the deterrence objectives of § 3553(a)(2)(B) without requiring 145 months.

The contrast in sophistication further reinforces the point. Hesenius evaded detection for five years through accounting manipulation. Dupiton masked his identity with VPN technology and exploited hundreds of stolen identities. Their schemes succeeded because they were hidden. Mr. Brooks's scheme was never hidden: branded masks, public Instagram posts, accounts in his own name, every deposit caught immediately. The point is not that Mr. Brooks lacked criminal intent. He readily acknowledges that he had the equipment and the knowledge. The point is that his conduct was so transparent it never evaded the detection systems designed to stop it, producing no victim loss. The advisory range would punish his unsuccessful, exposed scheme more harshly than concealed schemes that extracted millions from real victims.

Eleventh Circuit precedent also supports a variance under these circumstances. The Circuit vacates lenient sentences based on specific markers: magnitude of actual loss, duration, sophistication, and realized proceeds. *See United States v. Howard*, 28 F.4th 180, 207 (11th Cir. 2022) ("loss of over $3.5 million"; defendant "motivated by the $138,500 in illegal payments"); *United*

*States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("knowingly and methodically stole millions . . . over a period of several years"); *United States v. Crisp*, 454 F.3d 1285, 1291 (11th Cir. 2006) (loss "totaled more than $480,000" over "nearly eight months"). Those markers are absent here.

*Kuhlman* also emphasized that "[t]he Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status" and that it is "decidedly inappropriate" to rely on a defendant's "chosen profession and status" to justify a lower sentence. 711 F.3d at 1329. That principle cuts both ways. If high-status defendants are not entitled to leniency for successful theft, a defendant whose transparent scheme failed should not receive a harsher sentence simply because the mechanical loss calculation produces a higher number.

A sentence of 145 to 175 months, driven by a theoretical loss figure that produced no victim loss, is greater than necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, or afford adequate deterrence.

## Conclusion

Mr. Brooks respectfully requests that the Court impose a sentence of 36 months on Count 8, plus the mandatory consecutive sentence of 24 months on Count 12, for a total sentence of 60 months. Such as sentence is warranted in light of the absence of any victim loss, Mr. Brooks's conditions of pretrial confinement, the sentencing disparity this Court's own cases demonstrate, and the need for a sentence sufficient but not greater than necessary to serve the purposes of 18 U.S.C. § 3553(a).

Respectfully submitted this 24th day of August, 2026.

**PARKER, HUDSON, RAINER & DOBBS LLP**

*/s/ David A. O'Neal*
David A. O'Neal
Georgia Bar No. 342071
doneal@phrd.com

303 Peachtree Street, NE,
Suite 3600
Atlanta, Georgia 30308
(404) 523-5300

***Counsel for Shamarri Tache Brooks***